19-3524 from the Southern District of Iowa, United States v. Jonas Ross, III All right, Ms. Aragos, the court appreciates your willingness to accept the appointment in this case under the Criminal Justice Act, and you may proceed with your argument. Thank you, Your Honor. May it please the court, Mr. Cronk. I am honored to be here this afternoon on behalf of my client, Mr. Jonas Ross. On behalf of Mr. Ross, we are asking the court to reverse his conviction as to the charge of distribution of a controlled substance resulting in death because, first, the court erred in its assertion at the verdict hearing in this matter that the but-for cause of the decedent in this case, whose name was Mr. Kenny Payer, was a three-drug mixture sold by my client, Mr. Ross. There was, in fact, no evidence offered at trial that the decedent in this case had ever used the rock of a heroin mixture that my client had provided. Second, that there was insufficient evidence to prove that our client, Mr. Ross, sold the pure fentanyl, which apparently did kill the decedent. This case proceeded to a bench trial on one of the four counts in the indictment in May of 2019 in front of the Honorable Judge Rose. The death occurred sometime between November 30th and December 2nd of 2016. United States v. Barrage provides a roadmap for this court. Where a drug sold by the defendant was not a but-for cause of the drug user's injury or death by overdose, a defendant may not be liable for the injury or death of the user. In Barrage, the decedent died from a multi-drug overdose. The United States Supreme Court found that the drugs sold by Barrage to the decedent were not alone sufficient to have caused the decedent's death and reversed his conviction. Mr. Ross's case, the case at Bar here, provides an even more favorable factual situation for the defendant than Barrage and its progeny because there is no physical or forensic evidence that the decedent here used the three-drug mixture sold by our client to the decedent. And only the most speculative of testimony to indicate that our client may have sold the pure fentanyl at the scene. Just to provide some additional facts for the court's benefit, we've included snips or, you know, little smaller photos within our brief of some of the government's exhibits, notably photos from the crime scene. These photos show that there was a rock of heroin, fentanyl, and nodded and that that was completely intact when the decedent's body was found. Next to that, on the desk in this hotel room where the deceased was found, was a smattering of a trace amount of what turned out to be pure fentanyl. At trial, the government made a loose assertion through testimony that Mr. Ross may have also sold the fentanyl. But this is contrary to other facts in the case. Mr. Ross sold drugs to a confidential informant in a controlled buy with law enforcement in two other controlled buys prior to Mr. Payor's death and one after Mr. Payor's death. There was a course of investigation after the deceased was found in our case prior to our client's arrest. One hundred percent of the time when law enforcement was able to examine drugs sold by our client, who was an admitted heroin dealer, he was selling in single container or bag quantities. And one hundred percent of the time, these drugs were a mixture of heroin and other analogs. Our client, as far as law enforcement knew, had never sold pure fentanyl in the past and had never sold two separate packages of drugs at one time. Further, there was an assertion made by one of the government's witnesses, one of the law enforcement officers at Mr. Ross's trial, that it was unlikely that the deceased here would have called our client to order, to request drugs be delivered to him at his hotel room if he still had drugs remaining. There was evidence at the trial that the deceased in this case, based on his autopsy and toxicology, was a longtime drug user. And I would just like to point out to the court that it's interesting that the facts in Barrage, and in fact, every case that I have read proceeding from Barrage, were cases where the deceased had used multiple drugs and in Barrage itself, where the deceased had used drugs in the morning, then stole some drugs from a friend, then purchased other drugs later in the day. So in fact, all of the facts of the case law here flies in the face of that assertion by law enforcement at Mr. Ross's trial, that the deceased here would not have purchased from our client, Mr. Ross, if he still had a small amount of fentanyl remaining. In its brief, the government basically admits the court's error, as the government describes the holding in Barrage. The government points out that there's only one possible cause of death here, which was fentanyl intoxication. The government is admitting the court's error here, that the three drug mixture provided by our client could not have been a but-for cause of the decedent's death. In fact, one of the fentanyl analogs found in the heroin rocks sold by our client was called Feronil fentanyl. At trial, Dr. Marcus Nasielski, an esteemed pathologist from the University of Iowa Hospitals and Clinics, testified how he personally had performed the autopsy and toxicology testing on the body of Kenny Payer. He specifically requested, after hearing of the testing results of what the substances were found in the hotel room, that the body be tested for Feronil fentanyl, and there was no Feronil fentanyl found in the body of Kenny Payer. Well, I'm not sure the government quite conceded an error. I thought the government's position was that even if there were a three drug mixture, the morphine found could have been evidence of heroin use, and the Feronil fentanyl might have been used but not shown up in the autopsy for reasons that can be explained. I can, Your Honor. Of course, I am not a scientist, let alone a pathologist. I thought there was testimony that the Feronil fentanyl, for example, might have gone through the system and not been present then for testing, even if it had been ingested. My recollection was that Dr. Nashelski could not have absolutely ruled that out because Feronil fentanyl was a newer analog at the time, but the physical evidence also helps illustrate what happened here, that the trace amount of drugs found on the desk in Mr. Payer's hotel room was pure fentanyl, and it strains logic that somehow he could have broken off, if there was some other rock of a mixed drug mixture, just a piece of pure fentanyl to snort, which led to his death. And the three-drug mixture contained by our client, again, was in a double-wrapped baggie, which would have been very difficult for him to open and then close. And I hope I've answered your question to your satisfaction, Your Honor, and I would like to reserve the remainder of my time for rebuttal. You may. Thank you for your argument. Mr. Kronk, we'll hear from you. May it please the Court and Mr. Argibus, I'm Cliff Kronk from the U.S. Attorney's Office in Davenport, and I represent the United States. I was one of the trial lawyers in this case. I think the biggest problem, there's two problems here for Mr. Ross, and the first, of course, is the standard of review. Mr. Ross wants to point out a number of conflicts between his latest version of what happened with what the other evidence in the case is, and he actually suggests that Mr. Ross had no idea that Mr. Payer had ingested heroin and fentanyl and died until a detective interviewed him about that over a month later. The fact is, the strong circumstantial evidence and the other corroborating evidence shows that Mr. Payer had contacted Mr. Ross before he came to Davenport, contacted him as soon as he checked into the hotel, asked him for drugs, presumably heroin and not fentanyl, because I don't think anybody on the street actually deliberately ingests street fentanyl. They always ask for heroin, and what we're seeing more often is that heroin is mixed with fentanyl, which is the situation in this case. The thing that they're raising now that I'm essentially wasn't raised below is that in this indictment, the government referred to the mixture of drugs that Mr. Ross provided to Mr. Payer, and in fact, Mr. Ross doesn't deny that he provided these drugs to Mr. Payer. The fentanyl intoxication was proved beyond a reasonable doubt when you consider all the evidence in the light most favorable to the government, when you resolve all conflicts in the testimony in favor of the government, and when you take all reasonable inferences from the that Mr. Payer ingested were fentanyl and heroin provided by Mr. Ross on that date when he arrived in Davenport, contacted him by text, and by the way, contacted no one else. There's no evidence that he saw anybody after he saw Mr. Ross. There's strong evidence that Mr. Ross went to meet with him, delivered the packages of drugs, two packages. Mr. Payer opened one. As soon as Mr. Ross left or sometime after Mr. Ross left, he knew that Mr. Payer may have overdosed. He dropped his phone number that day, the day that he found out he had overdosed, which was essentially right after Mr. Payer died, and all of this shows not only that Mr. Ross delivered the drugs that resulted in Mr. Payer's death, but that Mr. Ross knew it. This suggestion that there's no evidence that he delivered two packages is simply not accurate. He actually said, how much do you want, one or two, and we established that it was two grams that he had ordered. There was an open package of drugs on the counter and the residual amounts there were pure fentanyl, but it is likely based on other drugs provided by Mr. Ross that he was providing a mixture of drugs that had fentanyl and heroin in them. Why would there be residual pure fentanyl if he provided a mixture? I'm sorry, Your Honor, I didn't mean to cut you off, but the testimony of the chemist was that mixtures are not homogenous. Equilibrium is not established in a package of mixed drugs, and so what was on the counter was such a small amount. It was less than a hundredth of a gram, if I'm not mistaken, and that was pure fentanyl. The other drugs that it was mixed with that were that open package, and what was left on the counter was fentanyl. Do you mean the government's theory was that some of the mixture could have been broken out and showed up as residual pure fentanyl, but originally come from a mixture? Yes. All right, and then what about fentanyl analog? What do you have to say about the fact that the unopened substance apparently had the analog in it, but there was none found in the body? Well, our theory on that is that the two packages are not the same, that Mr. Ross is not the one putting these drugs together. He's purchasing them in the form that he gets them, and he may be breaking them down and packaging them, which is a form of manufacture, but that they're coming from the source in a non-homogenous blend, and that either the substance Mr. Payer ingested contained the furanol fentanyl, and it was metabolized, or it didn't have furanol fentanyl in it at all. Either way, there's no evidence that someone else provided the drugs that Mr. Payer ingested, and there's strong evidence that Mr. Ross provided the exact drugs that Mr. Payer ingested, and that includes the fentanyl that was the but-for cause of his death. If there's no questions, I'll yield the rest of my time to the court. All right. Seeing no questions, we thank you for your argument, and we'll hear from Ms. Araguas. Do you pronounce the S at the end of your name, or is it silent? Well, you have to turn your microphone on. I'm sorry, Your Honor. You do pronounce the S. It's Araguas. Very well. You may proceed with rebuttal, if you wish. Thank you. I'd like to start with where Mr. Kronk left off, that Mr. Kronk said there's strong evidence that Mr. Ross provided the pure fentanyl that the decedent apparently ingested prior to his death. He doesn't list what that evidence might be, except that our client was a known drug dealer, and that the decedent here had ordered drugs from our client. He doesn't confront the fact that our client had participated in three other controlled buys, where he only sold single packages of drugs, and where he always sold in mixed quantities. Furthermore, Mr. Kronk said that Mr. Ross admitted to selling the three-drug mixture, which was the but-for cause of Mr. Payer's death. I just don't think we can ignore the fact that the three-drug mixture was not the but-for cause of Mr. Payer's death, that the unequivocal testimony of the pathologist, Dr. Noshelsky, was that it was a fentanyl intoxication that led to the death of Mr. Payer. To provide a little additional factual information for the court, Mr. Payer ordered two from Mr. Ross in a text message, two grams. The court does not need to find that any of Mr. Ross's testimony is to reverse Mr. Ross's conviction. Mr. Ross's guilty behavior could have been guilty behavior from using or selling drugs to Mr. Payer, and is not relevant to a but-for causal analysis under barrage. Thank you. I see that I have used all my time. Very well. Thank you to both counsel for your arguments. The case is submitted. The court will file an opinion in due course. Thank you, Your Honor.